# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

the residence located at 3143 N. 55th Street, Milwaukee,
WI 53216 more fully described in Attachment A

Case No. **19-856M(NJ)**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:
Title 18, United States Code, Section 1591(a) (sex trafficking by force, fraud, or coercion), Title 18, United States Code, Section 1591(d) (obstructing enforcement of Section 1591), and Title 18, United States Code, Section 1512 (obstruction of justice by witness intimidation)
The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Todd P. Higgins, TFO
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: May 8, 2019

*Judge's signature*

City and State: Milwaukee, Wisconsin                          Nancy Joseph, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Todd P. Higgins, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.    I am a deputized Federal Task Force Officer (TFO), with the United States Department of Justice, Drug Enforcement Agency, currently assigned to DEA Group 68, at the North Central High Intensity Drug Trafficking Area (HIDTA). I was deputized as a TFO with the DEA in 2018. In addition to being a TFO with the DEA, I have been a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigations (DCI) since 2014. Prior to my employment for DCI, I was a Detective for the City of Brookfield Police Department and I have been in law enforcement for over 18 years. My responsibilities as a TFO include the investigation of violent crimes, criminal enterprises, violations relating to the illegal sale and transfer of narcotics and firearms, and violent criminal acts in furtherance of criminal enterprises. In addition, my duties include the investigation of drug trafficking organizations and violations of federal narcotics and money laundering laws, including, but not limited to offenses defined by 21 U.S.C. § 841, 843, and 846, and 18 U.S.C. § 1956. I have received further specialized training concerning the interception of wire and electronic communications. I have also have training in regards to human trafficking and have worked such cases, at both the State and Federal level, for approximately 2 years.

2.    The lead investigator for this investigation is Special Agent Melissa A. Fus. Agent Fus is a Special Agent with the Wisconsin Department of Justice-Division of Criminal Investigation (DOJ-DCI) and has been in law enforcement since 2003. Agent Fus is currently assigned to the Human Trafficking Bureau for the Wisconsin Department of Justice and also the Federal Bureau of Investigation Wisconsin Human Trafficking Task Force ("WHTTF"). Agent

Fus's duties as a Special Agent with the WI DOJ-DCI include human trafficking investigations involving minors and adults. Agent Fus has gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state, and federal law enforcement agencies. I have discussed this case with Agent Fus.

3. The facts contained in this affidavit are known to me through my personal knowledge, training, and experience, and through information provided to me by other law enforcement officers, who have provided information to me during the course of their official duties and whom I consider to be truthful and reliable. Some of the information was provided in response to administrative subpoenas and search warrants, and I believe that this information is also reliable.

4. I have included here only the information necessary to establish probable cause. There are additional facts and information learned through the investigation that are not included herein.

## II. PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED.

5. I make this affidavit in support of an application for the issuance of a warrant to search a residence located at 3143 N. 55th Street, Milwaukee, WI, 53216 (hereinafter **"Target Residence"**) (further described in Attachment A), including all buildings, structures, storage facilities, and other artifices located at that address, in order to seize fruits, instrumentalities, and evidence related to possible violations of Title 18, United States Code, Section 1591(a) (sex trafficking by force, fraud, or coercion), Title 18, United States Code, Section 1591(d) (obstructing enforcement of Section 1591), and Title 18, United States Code, Section 1512 (obstruction of justice by witness intimidation). There is probable cause to believe

2

that fruits, instrumentalities, and evidence of these crimes (further described in Attachment B) will be found in a search of the premises.

## III. PROBABLE CAUSE

### A. Human Trafficking of AV-2

6. Special Agent Melissa Fus participated in interviews with an adult female (hereinafter referred to as AV-2) (DOB XX/XX/1991). AV-2 disclosed that she met Darren Hatchett II (DOB XX/XX/1985) in November 2008 in Indiana. AV-2 stated that sometime in 2010 or 2011, AV-2 began engaging in prostitution at Hatchett's direction.

7. In October 2011, AV-2 was interviewed by officers at the Anaheim Police Department in California. AV-2 stated to those officers that she and Hatchett left Indiana in approximately July 2011 and that shortly thereafter Hatchett instructed her on how to conduct prostitution activities. AV-2 stated she gave Hatchett all the money she made from those activities. A-2 stated that she was never allowed to keep any of the money and that if she wanted anything to eat or drink, she had to ask him for money.

8. AV-2 told Anaheim officers that Hatchett hit her all the time, that he choked her frequently and that, on at least one occasion, he choked her to the point where she passed out.

9. AV-2 stated to Anaheim officers that Hatchett and AV-2 traveled to Costa Mesa, California, with another adult victim (hereinafter referred to as AV-5) (DOB XX/XX/1990). AV-2 stated that because she was pregnant, Hatchett stopped posting her for prostitution dates and started posting AV-5. AV-5 also gave all the money she earned from prostitution activity to Hatchett.

10. While in Buena Park, California, in the fall of 2011, Hatchett began choking and hitting AV-2 while they were driving. AV-2 escaped by jumping out of the car, and Hatchett

pulled her back in by her hair. During this encounter, AV-2 was helped by a man who took her to the police station. After this incident, AV-2 returned to Indiana and gave birth to Hatchett's child.

11.     Based on interviews with AV-2 and others, AV-2 returned to Hatchett in 2015. AV-2 stated that after she returned to Hatchett in 2015 she lived with him in a house at 3411 W. Clybourn Street, in Milwaukee (hereinafter referred to as "Hatchett's Residence"). She remained living in Hatchett's Residence until she left Hatchett in May 2018. AV-2 believed Hatchett owned the house. AV-2 stated that Hatchett would sometimes lock the house to prevent her from leaving, and that he had multiple cameras set up in the interior and exterior of the house.

12.     She again engaged in prostitution at his direction and gave the money she earned from prostitution activity to Hatchett. Hatchett continued to be violent toward AV-2. In 2015, Hatchett broke AV-2's jaw and she had to have it wired shut for approximately six weeks. AV-2 stated that Hatchett's violence toward her was a regular occurrence. Hatchett hit her in the head with guns. On at least two occasions he broke her skull and caused bleeding. He also dragged her down the stairs, hit her with an electrical cord all over her body, hit her with the handle of a mop or broom, shot at her, and locked her in a dog kennel in a bedroom. While she was in the kennel, Hatchett threatened to shoot her. These instances of abuse, including the shooting, primarily occurred at Hatchett's Residence.

13.     AV-2 reported that Hatchett possessed several firearms, which he eventually stored in a large safe at his residence on Clybourn. Those firearms included handguns and assault rifles. At one point, Hatchett gifted AV-2 an assault rifle that he had customized. When AV-2 left Hatchett in May 2018, she did not take the firearm with her. Even after the rifle was gifted to her, the firearm remained at Hatchett's Residence.

4

14.     In addition to physical violence, Hatchett regularly threatened to harm AV-2's family if she left him and verbally abused AV-2 by calling her stupid and telling her that her brain was messed up.

15.     During her time with Hatchett, AV-2 became addicted to Percocet. According to AV-2 and others, Hatchett withheld opioids from AV-2 as punishment if she did not do what he wanted. He also used Percocet as a reward or incentive to get her to engage in prostitution for his financial benefit.

16.     AV-2 stated that during the time she was with Hatchett she traveled to multiple states, including Arizona, California, Illinois, Texas, New York, Virginia, and Colorado to engage in prostitution.

17.     Multiple other victims and witnesses provided statements to law enforcement about Hatchett and AV-2. Those statements are consistent with AV-2's reports to law enforcement.

18.     Record searches of websites commonly used for prostitution revealed ads for prostitution by AV-2 in Dallas, Kansas City, Virginia, Louisiana, Denver, Milwaukee, Manhattan, South Carolina, and Pennsylvania.

19.     AV-2 stated that she travelled out of state with other women who also engaged in prostitution activity for Hatchett's financial gain. She identified other adult victims hereinafter referred to as AV-1 (DOB XX/XX/1997), AV-3 (DOB XX/XX/1999), AV-4 (DOB XX/XX/1997), and AV-6 (DOB XX/XX/1994), as women who worked for Hatchett. AV-2 stated that the state she went to most frequently was Texas.

20.     A search of flight records confirm AV-2's statements. For example, AV-1 and AV-2 flew from Chicago to Dallas on flights purchased by Hatchett on May 5, 2017, May 25,

5

2017, and October 25, 2017. On May 5, 2017, AV-6 also flew with AV-1 and AV-2. On May 30, 2017, AV-1 and AV-2 were the subject of a police report in Irving, Texas, in which the police officers noted evidence of prostitution in the hotel room in which AV-1 and AV-2 were staying. On April 23, 2018, and April 27, 2018, AV-2 and AV-3 flew to Denver and back on flights paid for by Hatchett.

21. AV-2 stated that she gave all of the money she earned from prostitution to Hatchett. AV-2 stated that when she traveled out of state, she would send Hatchett the money made from her prostitution activities by depositing the money in Hatchett's bank accounts. AV-2 stated that when she was in Texas, she deposited money into Hatchett's bank accounts.

22. AV-2 also stated that she would sometimes use services such as GoBank and Bluebird to transfer money to Hatchett at gas stations and Wal-Mart.

23. AV-2 stated that she never had her own money or bank accounts. AV-2 stated that when she decided to leave Hatchett, she secretly sent some of the money she earned to her mother. She stated that she was scared of what Hatchett would do if he found out, but that she needed to do so to avoided being stranded with her children.

24. In May 2018, AV-2 left Hatchett and moved back to Indiana. She had no money. Hatchett has continued to threaten AV-2 and has been physically abusive toward her on at least one occasion since she left him.

**B. Human Trafficking of AV-5.**

25. I participated in interviews with AV-5. AV-5 disclosed that she met Hatchett online in 2011 and that on August 26, 2011, Hatchett and AV-2 picked her up in Indiana and drove to Indianapolis. AV-5 believed that she was going to be dancing in a gentleman's club. But when they arrived in Indiana, AV-5 learned that Hatchett intended that she engage in

6

prostitution. In Indianapolis, AV-5 engaged in prostitution for the first time and gave all the money she earned to Hatchett.

26. AV-5 conducted prostitution activities for Hatchett's financial gain for approximately the next four years.

27. During that time, Hatchett controlled every aspect of AV-5's life. For example, Hatchett decided what cities they traveled to and when. Hatchett also decided whether, when, and for how long AV-5 was allowed to visit with family. Hatchett also controlled AV-5's social media accounts.

28. Hatchett's only source of income was the money made by AV-5 and others engaging in prostitution for his benefit.

29. AV-5 stated that starting in 2015, she and Hatchett resided at Hatchett's Residence. They continued to reside there until AV-5 left Hatchett in July 2018. Utilities at Hatchett's Residence were registered to AV-5 in April 2015. As of March 1, 2019, the utilities were in Hatchett's name.

30. AV-5 stated that Hatchett was often violent with her. The violence occurred on a regular basis and included Hatchett choking her, breaking her nose, hitting her with guns, shooting at her, pushing her down the stairs, and picking her up by the throat and throwing her to the floor. Much of this violence occurred at Hatchett's Residence. AV-5 reported that Hatchett's Residence had bullet holes in the walls where Hatchett shot at her and other victims. AV-5 reported that she saw Hatchett shoot at AV-3 in the basement of Hatchett's Residence.

31. AV-5 reported that Hatchett possessed several firearms including assault rifles and that he has a CCW permit. AV-5 reported that Hatchett stored the firearms in a large safe in his residence on Clybourn.

Case 2:19-mj-00856-NJ   Filed 12/16/19   Page 8 of 30   Document 1

32. AV-5 also became addicted to opioids and Hatchett would use that addiction to further control her by, among other things, withholding those opioids as punishment and causing AV-5 to experience withdrawal symptoms.

33. AV-5 described traveling to a variety of cities and states to engage in prostitution at Hatchett's direction and control. Flight records show that Hatchett and AV-5 flew to Dallas in March and April 2015. Hotel records show that AV-5 often rented hotel rooms in Dallas in 2013 and 2014.

34. AV-5 also identified other victims of Hatchett's human trafficking, including AV-1, AV-2, AV-4, and AV-6.

35. AV-5 left Hatchett in July 2018. AV-5 left with no money despite the fact that she estimates she made over a $1,000,000 for him. Hatchett has continued to threaten AV-5 and her family by phone.

## C. Human Trafficking of AV-1

36. In July 2018, I was contacted by Pewaukee Police Department regarding information on AV-1.

37. Pewaukee Police Sergeant Wright indicated that on July 14, 2018, his agency had contact with AV-1 and her family. At the time of the contact, AV-1's family reported that AV-1 was a victim of Human Trafficking and the family was attempting an intervention with AV-1. AV-1 attempted to evade the intervention and the Pewaukee Police Department was called.

38. Pewaukee Police Department officers described AV-1 as emaciated and having narcotic withdrawal symptoms. They determined that AV-1 had outstanding warrants and she was taken into custody. AV-1's family reported that Hatchett, living at Hatchett's Residence, was soliciting AV-1 for prostitution. AV-1's mother reported that AV-1 was a victim of a

Human Trafficking ring in Milwaukee and AV-1 has contacted her family members several times to help her get out of the situation. AV-1's mother also told Pewaukee officers that AV-1's boyfriend, Hatchett, was very abusive and possessive. AV-1's mother also told the Pewaukee Police Department officers that AV-1 had a drug addiction. AV-1's mother also advised Pewaukee officers that there were other possible female victims who were at Hatchett's residence, in Milwaukee.

39.     During AV-1's contact with Pewaukee Police Department officers, she disclosed that she resided with a group of girls. AV-1 commented that "she was just happy to be away from the house and out of the situation". AV-1 also told officers that she had not eaten for several days.

40.     I conducted interviews with AV-1's mother and sister. Both indicated to officers that they were aware, based on statements by AV-1, that there were multiple females who reside with Hatchett and conduct prostitution activities for Hatchett.

41.     AV-1's mother said she knew of another female, AV-2, who AV-1 was frequently with. AV-1's mother indicated that AV-2 has child(ren) with Hatchett but she recently left Hatchett and returned to Indiana.

42.     AV-1's mother also told officers that she knew AV-1 travelled to various states including Texas and New York to engage in prostitution activities for Hatchett.

43.     A forensic examination of AV-1's phones showed numerous communications between AV-1 and male individuals that were consistent with AV-1 conducting prostitution activities. These conversations show that AV-1 was engaging in prostitution in multiple states including, but not limited to, Texas, California, and New York. The phone also contained many messages between AV-1 and Hatchett in which Hatchett and AV-1 discussed AV-1's "quota" for

prostitution activities and in which Hatchett repeatedly threatened extreme violence against AV-1 and her family. For example, on March 1, 2018, Hatchett threatened to "rape yo mom and brothers" and "kill yo granny and sister with a meat cleaver." On another occasion he threatened to beat her head.

44.     During interviews with AV-1, AV-1 stated that she engaged in prostitution while working for Hatchett. AV-1 stated that she was first introduced to Hatchett by another male, Brian Pointer (DOB XX/XX/1993). According to a police report from November 2011, Pointer was Trenell Henning's, Hatchett's relative's, foster son. AV-1 stated that she met Pointer on social media and that he recruited her to "work" with him and his girlfriend, AV-4. Records of AV-1's Facebook account corroborate AV-1's statements that she was initially recruited for prostitution by Pointer who told AV-1 that he and AV-4 were making money while traveling.

45.     AV-1 stated that she moved in with Pointer (to Hatchett's Residence) in mid-February 2017. AV-1 said that after moving into that house, she engaged in prostitution at Pointer's direction and gave all the money she made to Pointer. AV-1 said that shortly after she moved into Hatchett's Residence she traveled to Texas with Pointer and they met AV-4 there. AV-4 and AV-1 engaged in prostitution in Texas and gave the money they made to Pointer. AV-1 flew back to Milwaukee for a court hearing on February 24, 2017. After that she went back to stay at Hatchett's residence, but Pointer was not allowed to return. Shortly thereafter, AV-1 began engaging in prostitution for Hatchett and giving him all the money she made. AV-1 believes that Hatchett did not let Pointer return to the house because Hatchett wanted to control AV-1 and the money she made.

46.     AV-1 stated that shortly after she began engaging in prostitution activities for Hatchett's financial benefit, AV-4 also began working for Hatchett.

47.     AV-1 disclosed that she provided all the money she earned from her prostitution encounters after February 2017 to Hatchett. AV-1 also admitted that Hatchett controlled every aspect of AV-1's life, including who she was allowed to interact with in person and on her social media account. AV-1 also said that Hatchett dictated the cities and states to which she travelled to engage in prostitution activities. AV-1 stated that Hatchett was often violent with her and provided examples, including that on multiple occasions Hatchett choked her and on at least one occasion he shot at her with a firearm at Hatchett's residence. AV-1 disclosed that Hatchett kept a number of firearms in the residence on Clybourn. Most recently, the firearms were stored in a large safe in the residence.

48.     During these interviews, AV-1 identified photographs of other victims of Hatchett's human trafficking. Those identifications included, but were not limited to AV-2, AV-3, AV-4, AV-5, and AV-6. AV-1 discussed Hatchett's violence against his victims, particularly AV-2. AV-1 also discussed how Hatchett controlled the number of pills that AV-2 consumed.

49.     AV-1 also talked about her out-of-state travel with the other victims, including AV-2, and their transmittal of all of the money they made from prostitutions dates to Hatchett via bank accounts and other wire transactions. AV-1 reported that she estimates she made $500,000 from prostitution activity while working for Hatchett. When she left Hatchett in July 2018, she had no money.

50.     Special Agent Melissa Fus obtained jail calls from the Waukesha County Jail made by AV-1 while AV-1 was incarcerated. The jail calls were dated from July 14, 2018, to November 18, 2018. AV-1 made frequent outgoing phone calls to Hatchett during the above dates. AV-1 frequently called Hatchett "Daddy." Based upon my training and experience,

individuals who engage in human trafficking commonly require that the women who engage in prostitution activities for them call them "Daddy."

51.     When AV-1 talked to Hatchett on the jail phone, she would occasionally talk to other females who were with Hatchett.

52.     During some of the jail calls, Hatchett told AV-1 that he was out-of-state. For example, on November 11, 2018, Hatchett told AV-1 that he just left California and was headed to Denver. Hatchett also told AV-1 that he had been out of town for almost one month, since the day after he visited AV-1 in jail. According to AV-1's visitor log, Hatchett visited AV-1 at the Waukesha County Jail on September 18, 2018. On November 18, 2018, AV-1 asked Hatchett "You back?" and Hatchett replied, "Hell no." Hatchett said he left one light on in the house (the one when you "first walk in") so it didn't "look dead in that motherfucker."

53.     During a jail call with Hatchett on October 31, 2018, Hatchett told AV-1 that he could access and control the Facebook accounts of AV-4 and AV-6.

54.     AV-1 stated that Hatchett also had access to, and could control, her Facebook account when she was with him. AV-1 stated that Hatchett had control over the account when she went to jail in mid-July 2018. On July 30, 2018, Hatchett (using AV-1's Facebook account) message L.V. and to recruit L.V. to work with AV-1. During that conversation, L.V. wrote that she was threatened by AV-3, but got along with AV-4. Hatchett responded that "Daddy will make her put all that to the side I promise u that" and told L.V. to text "406-7364." That number belongs to Hatchett. L.V. subsequently asked "Do you get to keep your money and stuff or like half and half or all of it goes to your daddy" and the Facebook account for AV-1 responded: "I'm pretty sure u know the answer to that but I guess it's cute to test the water lol."

**D.      Human Trafficking of AV-3, AV-4, and AV-6 and Execution of Search Warrants.**

55. During a jail call with Hatchett on October 31, 2018, Hatchett told AV-1 that he could access and control the Facebook accounts of AV-4 and AV-6.

56. During interviews with AV-1 as recently as April 2019, AV-1 stated that Hatchett was traveling with AV-4, AV-6, and AV-3.

57. On February 23, 2019, AV-5 told law enforcement that Hatchett told AV-5 that he was in California with AV-3, AV-4, and AV-6.

58. Since February 2019, law enforcement has been obtaining prospective location data for Hatchett's phone, (414) 406-7364. Those records reflected that during March and April 2019, Hatchett had been in the Los Angeles area, San Francisco area, and Denver.

59. In April 2019, law enforcement obtained location data for AV-4's and AV-6's phones. That data showed that during the month of April, AV-4 and AV-6's phones were in the same areas as Hatchett. Prostitution ads posted online for AV-4 and AV-6 during this time also showed them in the same areas as Hatchett's phone.

60. As of April 18, 2019, Hatchett's phone, AV-4's phone, and AV-6's phone were in Iowa City, Iowa.

61. As of about 12:30 p.m. on April 19, 2019, Hatchett's phone, AV-4's phone, and AV-6's phone were travelling together from Davenport, Iowa to Illinois on Interstate 88.

62. On April 19, 2019, at approximately 3:00 p.m., Hatchett was arrested driving a Volvo car with California license plates. AV-3, AV-4, and AV-6 were passengers in the Volvo. Incident to Hatchett's arrest, law enforcement officers recovered a loaded firearm from the driver's seat area of the Volvo. The firearm was under the driver's seat with a portion of the firearm in plain view. The firearm is further described as a REX Zero 1CP 9mm handgun,

bearing serial number A09660. During his post-arrest interview, Hatchett admitted that the 9mm handgun was his.

63.     After Hatchett's arrest, AV-3 and AV-6 provided statements to police. During those statements, AV-3 and AV-6 made disclosures consistent with those of AV-1, AV-2, and AV-5. Both AV-3 and AV-6 admitted to engaging in prostitution activities for Hatchett's financial gain. Both stated that they gave all of the money they earned from prostitution activities to Hatchett. AV-3 provided details of Hatchett's violence toward her as well as AV-4, describing instances in which Hatchett choked and punched them repeatedly.

64.     AV-3 also discussed that Hatchett owned a number of firearms. AV-3 stated that Hatchett exchanged firearms with Trenell Henning on multiple occasions, and AV-3 suspected that any firearms not found at Hatchett's residence may be located at Henning's residence or at Hatchett's grandmother's residence. AV-3 knew Henning to be a relative of Hatchett.

65.     On April 19, 2019, at approximately 4:07 p.m., law enforcement officers executed a search warrant at Hatchett's residence. During that search, officers seized numerous rounds of ammunition and boxes for firearms, but did not recover any firearms. A large safe was located in the house, but it was unlocked and contained no firearms. In addition, officers recovered a number of documents from the residence, including a list of firearms ("Firearms List") and documents related to a business in the name of Untouch Enterprises LLC and Untouch Enterprices LLC.

66.     The firearms list is a handwritten list on a lined piece of paper in spiral notebook. The list describes 18 firearms, including multiple assault rifles. The firearms are described by make and model and includes serial numbers for all but five of the firearms. The list also includes the number of "mags" (believed to be magazines) associated with each firearm. The list

14

also includes names associated with some of the firearms. The names are: Darren H.; Terrence H.; Trenell H.; and Mario S. For example, one line item has the description: "1. Glock 19 9mm (serial #) BGNL649 Trenell H. 5x (mags)." Six of the firearms have "Private" listed as the name associated with the gun.

67.    One of the firearms described on the Firearms List has the same make, model, and serial number as the firearm recovered from underneath the driver's seat of the Volvo Hatchett was driving on April 19, 2019. On the Firearms List, the name associated with this firearm is "Darren H."

68.    On September 8, 2018, Milwaukee Police Officers responded to a complaint of a Subject with a Gun. Dispatch alerted the officers that the tenant of the lower unit of the duplex at 3143/3145 N. 55th Street had "pulled a gun out" on the tenant of the upper unit of the duplex. The upper unit occupants, I.A. and P.C., told police that Henning is the nephew of the property owner. The property owner's family lives in the lower unit and Henning resides in the basement of the duplex. The I.A. reported to police that Henning had been in a verbal altercation with P.C. I.A. saw Henning point a gun at P.C. I.A. called 911.

69.    P.C. told police that he was talking with Henning's aunt when Henning came up from the basement with a black handgun. Henning pointed the gun at P.C. and threatened to shoot him. P.C. saw an unknown male subject bring Henning another large gun which was inside a duffel bag. P.C. reported that the day earlier (September 7, 2018), Henning had come to P.C.'s unit armed with a black handgun. Henning had yelled "I should shoot your big ass!" while racking the slide of the handgun and pointing it at P.C.

15

70. When questioned on September 8, 2018, Henning's aunt, R.M., reported that Henning did have a firearm on him when he was talking with P.C., but did not point the firearm at anyone.

71. Henning told police that he resides in the basement of the duplex. His aunt and grandmother reside in the lower unit and his uncle owns the duplex. Henning stated that he heard P.C. talking negatively to his aunt, so he came upstairs. Henning admitted that he had his "Glock 19" handgun in his hand when he approached P.C. Henning refused to consent to a search of the basement for weapons.

72. Officers obtained a search warrant. Officers recovered three firearms, two BB guns, and mail addressed to Henning. One of the three firearms was a rifle and was found in a large, green camouflage duffel bag. The firearms were described as follows: a loaded black Glock 19 9mm pistol, with serial number BGNL649; a loaded black Desert Eagle .44 caliber pistol with serial number 86405-S; and a fully loaded black Arsenal SAM7K Cal 7.62x39 assault rifle with an attached mounted scope, with serial number BA534214. All three of these firearms appear on Hatchett's Firearms List. The Glock 19 has the name "Trenell H" listed. Thus, I believe that references to "Trenell H." on Hatchett's Firearms List correspond to Trenell Henning. The Desert Eagle has "Private" listed in the name column. The Arsenal SAM7K assault rifle had "Trenell H" listed. These firearms are still in custody of the Milwaukee Police Department.

73. In addition to the two firearms recovered on September 8, 2018, at least one other firearm is listed under "Trenell H" on Hatchet's list. That firearm is described as a Shockwave 12 gauge (shotgun) bearing serial number V0605527.

**E. Untouch Enterprices LLC**

74.     A review of the Wisconsin Department of Financial Institutions website reflects that on September 14, 2017, a business under the name Untouch Enterprices LLC was registered. The listed registered agent is Trenell Henning, with an address of 3411 W. Clybourn in Milwaukee, Hatchett's Residence. According to AV-2, Henning never lived at Hatchett's residence on Clybourn.

75.     AV-5 was familiar with Hatchett operating a business called Untouch Enterprices. AV-5 reported seeing bank account information related to Untouch Enterprices at Hatchett's Residence. AV-5's understanding was that the business was in both Hatchett's and Henning's names. AV-5 believed that Henning was Hatchett's brother.

76.     AV-3 reported that Hatchett often referred to himself and the women conducting prostitution dates for his financial gain as "untouchable." When questioned further about this, AV-3 reported that this was because he had been doing this activity for so long and had evaded any law enforcement detection.

77.     On April 19, 2019, while executing a search warrant at Hatchett's residence, officers recovered the document titled "Operating Agreement of Untouch Enterprises LLC." The agreement indicates that it was executed on September 28, 2017, between the following individuals: Trenell Henning; Darren Hatchett; and Terrence Hatchett.

78.     The Operating Agreement lists that "[t]he company's purpose is to invest partners shared 'pool' money into multiple investments." Each member agreed to split the total cost of investment into the company with the two other members. Therefore, each member agreed to invest 33.3% in the company, and each member was to receive an equal share of any distributions or profits of the company. The copy of the Operating Agreement recovered in Hatchett's home was signed by Trenell Henning and Terrence Hatchett, but not Darren Hatchett.

17

## F.    Recorded Jail Calls

79.    Law enforcement obtained a copy of Hatchett's jail calls while in pretrial detention at the Dodge County Jail beginning on April 22, 2019, through April 25, 2019. During that time period, Hatchett had several calls with Henning.

80.    During those calls, Hatchett repeatedly asked Henning to get in touch with several of the above-listed victims. Henning reported back to Hatchett his efforts to get in touch with the victims and identify their locations. For example, during a call on April 22, 2019, Henning told Hatchett that one of the victim's phone's location information showed that it was at 6th and Wisconsin. During a call on April 23, 2019, Henning reported to Hatchett additional efforts to get in touch with several of Hatchett's victims and provided Hatchett with phone numbers of two of the victims. Shortly thereafter, on the same day, Hatchett called both of those victims using the phone numbers provided to him by Henning. During another call on April 23, 2019, Henning called one of Hatchett's victims so that Hatchett could talk to the victim while Henning was on the line. Afterwards, Hatchett and Henning discussed whether the victims who have cooperated with police are "jammed up" and whether they have any incentive to come to court.

81.    Hatchett and Henning also discuss the allegations of the complaint, and on a call on April 24, 2019, Henning tells Hatchett that they are going to figure out the identity of everyone who cooperated with the police.

82.    On that same call, Henning and Hatchett also discussed how to prevent Hatchett's residence, which was purchased with proceeds from Hatchett's illegal human trafficking, from being seized by the government. One avenue they discussed was putting the house in the name of the LLC (presumably, Untouch Enterprices) to make it "untouchable" and unable to be put up for sale.

83.     During a jail call on April 24, 2019, Henning provided the following address to Hatchett as Henning's address: 3143 North 55th **(Target Residence).**

84.     During several jail calls, Henning and Hatchett discuss Brian Pointer and the need to give Pointer advance knowledge of the potential investigation against him for human trafficking violations. During one of the calls, Henning told Hatchett that he discussed the case with Pointer and provided him with information about the allegations against Hatchett and told him that AV-1 told agents about Pointer's involvement in human trafficking.

## G.     Surveillance of Henning at Target Residence

85.     On April 26, 2019, at approximately 3:50 p.m., law enforcement officers conducted surveillance at the address of **Target Residence**. At approximately 4:20 p.m., a black four door Chrysler 200 bearing Wisconsin registration of AAB-9635, travelled north on the 3100 block of N. 55th Street and parked in front of 3130 N. 55th Street. The driver of the vehicle exited and was identified as Henning. Henning was then observed entering the front door of the **Target Residence.**

86.     On May 3, 2019, at approximately 9:41 a.m., law enforcement conducted surveillance at the **Target Residence**. The Chrysler 200 bearing Wisconsin registration AAB-9635 was parked across the street of the **Target Residence**. At approximately 9:43 a.m., Henning was observed leaving the **Target Residence.** Henning walked to the Chrysler 200 bearing Wisconsin registration AAB-9635 and entered the driver's seat. Henning then left the residence in the described vehicle. A few minutes later, Henning returned to the **Target Residence**, entered the residence, and then left again in the Chrysler 200.

87.     Law enforcement conducted a record check on the registration of the Chrysler 200 bearing Wisconsin registration AAB-9635. The record check revealed that the vehicle was a

2015 Chrysler 200 Sedan (VIN 1C3CCCAB6FN685806) and was registered to Latasha N. Shaw (XX/XX/83) and Trenell A. Henning (XX/XX/83). The address listed on the Chrysler's registration as well as Henning's Wisconsin Department of Transportation driver's license is the **Target Residence**.

## IV. PROBABLE CAUSE TO BELIEVE EVIDENCE, FRUITS, AND INSTRUMENTALITIES OF CRIMINAL ACTIVITY WILL BE FOUND AT THE TARGET RESIDENCE.

88.     Henning's involvement in and/or knowledge of Hatchett's sex trafficking activity has been discussed by nearly every victim interviewed by agents in this case.

89.     AV-1, AV-2, AV-3, AV-5, and AV-6 all identified a photograph of Henning. Nearly all identified Henning as "Tree" and stated that they believed "Tree" was Hatchett's brother. Hatchett's victims stated that Henning was frequently at Hatchett's Residence.

90.     Henning's conversations with Hatchett during Hatchett's incarceration corroborate these victim's statements. Not only is Henning aware of the contact information for many of Hatchett's victims, but he is in fairly regular contact with them since Hatchett's arrest. During jail calls, Hatchett frequently directed Henning to establish or maintain contact with Hatchett's victims. On multiple occasions Henning complied with Hatchett's directions to establish and/or maintain contact with Hatchett's victims. Henning also promised Hatchett to figure out who cooperated with police against Hatchett. Given these conversations, evidence of Henning's communications with, and efforts to locate, Hatchett's victims is likely to be found at the **Target Residence.**

91.     Based on AV-5's statements, as well as business records, Henning and Hatchett are business partners in Untouch Enterprices LLC. Based on their jail-call conversations, Henning and Hatchett intend to use that business to purchase Hatchett's Residence in an attempt

to protect proceeds of Hatchett's illegal activities from government seizure. Documents related to the business venture will, therefore, be relevant to establishing Hatchett's illegal activity and the location of the proceeds of those activities. Given Henning's involvement in the venture, those documents are likely to be found in the **Target Residence.**

92. Based on the Firearms List located during the search of Hatchett's Residence, as well as the statements of AV-3 regarding the probable location of Hatchett's firearms, which Hatchett used to further effect the illegal conduct described herein, Hatchett's firearms are likely to be found in the **Target Residence.**

## V. COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

93. As described above and in Attachment B, this application seeks permission to search for records that might be found at the **Target Residence**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

94. *Probable cause.* I submit that if a computer or storage medium is found at the **Target Residence**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

> a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

95. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the

**Target Residence** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw

Case 2:19-mj-00856-NJ   Filed 12/16/19   Page 24 of 30   Document 1

conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

96. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information.

Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

97. *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

98. *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

99. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

100. Because multiple people may share the **Target Residence** as a residence, it is possible that the **Target Residence** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those

25

computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## VI. CONCLUSION

101.    Based on the foregoing, there is probable cause to believe that fruits, instrumentalities, and evidence of Sex Trafficking by Means of Force, Threats, Fraud, and Coercion against AV-1, AV-2, AV-3, AV-4, AV-5, and AV-6 and obstruction of justice by intimidation of witnesses (further described in Attachment B) will be found in a search of the Target Residence (further described in Attachment A).

## **ATTACHMENT A**

The premises to be searched is the residence located at 3143 N. 55th Street, Milwaukee, WI 53216. The residence is a two-story residence with a single front door. The residence is constructed with white horizontal siding on the upper half and red brick on the lower half. The numbers "3143" and "3145" are affixed to the brick on each side of the front door. The garage is detached and located to the west of the residence. The garage is a two car garage with two separate garage doors. The number "3143" is affixed above the southern garage door. Photographs of the residence and detached garage are provided below:

 

## ATTACHMENT B

All records relating to violation of 18 U.S.C. §1591(a) and 8 U.S.C. §1512, from January

2011 to the present, including:

1. Firearms including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, and any and all documentation related to the purchase of such items;

2. All bank records, checks, credit card bills, account information, and other financial records;

3. Financial records reflecting earnings, income, profits, and assets of Untouch Enterprises, LLC, Untouch Enterprices LLC, or any other entity connected with Hatchett or human trafficking;

4. Records of ownership of online financial accounts by Untouch Enterprises LLC, Untouch Enterprices LLC, or any other entity connected with Hatchett or human trafficking;

5. Books, records, receipts, notes, ledgers, airline tickets, money orders, money wire transfer receipts, and other papers relating to the illegal conduct described herein;

6. Proceeds of human trafficking activities including, but not limited to, cash, jewelry, and clothing;

7. Personal telephone books, keys, address books, telephone bills, photographs, videotapes, letters, cables, telegrams, facsimiles, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in human trafficking activities;

8. Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and / or video recordings, pictures, settings, and any other user defined settings and/ or data;

9. Any and all electronic devices, including but not limited to computers, and computer equipment, which may contain digital evidence such as photographs, videos, or communications regarding the illegal conduct described herein;

10. Photographs of Hatchett or any human trafficking victims or which depict evidence of the illegal conduct described herein;

11. Documents and deeds reflecting the purchase or lease of real estate, vehicles, jewelry, clothing, travel, or other items obtained or purchased with the proceeds from human

trafficking activities;

12. Records of mail and communications services, telephone pagers, answering machines, telephone paging devices, beepers, car telephones, cellular telephones and other communication devices which evidence participation in human trafficking activities;

13. Indicia of ownership, by Untouch Enterprises LLC, Untouch Enterprices LLC, or any other entity connected with Hatchett, of the property, including titles, insurance documents, bills of sale, keys, lease/rental agreements, and loan payment receipts;

14. Controlled or illicit substances, including but not limited to opioids;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).